NORTHERN CRAWFISH FROG (RANA AREOLATA CIRCULOSA),[1] The Federation To Rescue Our Greenspace, an Unincorporated Association and Clark H. Coan, Plaintiffs,

v.

The FEDERAL HIGHWAY ADMINISTRATION, Defendant.

No. 93–4028–SAC.

United States District Court, D. Kansas.

July 1, 1994.

1. According to the plaintiffs' complaint, the Northern Crawfish frog, *Rana areolata circulosa,* is a Kansas species which inhabits the Baker Wetlands, 11.89 acres of which is proposed to be filled during the construction of the South Lawrence Trafficway. The plaintiffs contend that the Northern Crawfish frog is "in need of conservation."

Donald G. Strole, Sally G. Kelsey, Law Office of Donald G. Strole, Lawrence, KS, Robert V. Eye, Irigonegaray & Associates, Topeka, KS, Dennis J. Highberger, Lawrence, KS, for plaintiffs.

Helen Mountford, Federal Highway Admin., Kansas City, MO, Jackie A. Rapstine, Office of U.S. Atty., Topeka, KS, Martha R. Steincamp, U.S. E.P.A., Kansas City, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

On February 8, 1993, the plaintiffs commenced this action for declaratory and injunctive relief, challenging the decision of the defendant, the Federal Highway Administration (FHWA),[2] to participate in the construction of the proposed South Lawrence Trafficway (SLT)[3] in Douglas County, Kansas.[4] The plaintiffs contend that the route selected for the SLT involves the taking of public parkland without a determination that the parkland is not significant or that there is no reasonable and prudent alternative to such

---

**2.** On September 13, 1993, the plaintiffs voluntarily dismissed the Environmental Protection Agency as a defendant. *See* (Dk. 32).

**3.** As described in the Final Environmental Impact Statement, "[t]he proposed project consists of the construction of approximately 15 miles of four-lane divided roadway from the vicinity of the Kansas Turnpike northwest of Lawrence to a connection with K–10 Highway at Noria Road along the western and southern sides of the City of Lawrence in Douglas County, Kansas." The estimated cost of the SLT is approximately $40,000,000 in 1988 dollars.

**4.** The City of Lawrence is located approximately 45 miles west of the greater Kansas City, Missouri, area. The University of Kansas and Haskell Indian Junior College are located in Lawrence, Kansas.

taking. The plaintiffs also challenge the decision by the defendant to approve a Final Environmental Impact Statement (FEIS) that they contend does not consider all of the reasonable alternatives to the project and is otherwise defective.

The plaintiffs' action arises under and alleges violations of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*, the Department of Transportation Act of 1966, 49 U.S.C. § 301, *et seq.*, the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138, *et seq.*, the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, Executive Order 11990, the Administrative Procedures Act, 5 U.S.C. § 553, *et seq.*, and the regulations issued pursuant to those statutes.

In Counts I and II of their complaint, the plaintiffs challenge the FHWA's determination that 23 U.S.C. § 138 and 49 U.S.C. § 303(c) and its implementing regulations are not applicable to the newly created Lawrence Prairie Park. Counts III through VIII challenge the adequacy of the Final Environmental Impact Statement and the Record of Decision issued by the FHWA for the SLT. Count IX challenges the FHWA's determination that there was no conflict of interest in violation of 40 C.F.R. § 1506.5(c) in the preparation of the FEIS.

In short, the plaintiffs seek an order halting any and all acquisition of right-of-way and all construction activity related to the proposed SLT. The plaintiffs request that such an injunctive order remain in effect until the defendant adopts a route for the proposed SLT that does not require the taking of protected parkland and until the defendant prepares and approves a supplementary Environmental Impact Statement (EIS) which examines the effect of the proposed route and all other reasonable alternatives on protected park land and protected wetlands.

This case comes before the court upon the FHWA's motion for summary judgment (Dk. 41) and upon the plaintiffs' cross-motion for summary judgment (Dk. 43). Each side has responded to their opposition's motion, and each side has filed a reply brief.

Decocted to its simplest form, it is the FHWA's position that the FEIS evaluating the need for and the impact of the SLT was made in compliance with all relevant rules and regulations and that the FEIS is amply supported by the materials contained in the voluminous Administrative Record. The FHWA contends that its approval of the FEIS was neither arbitrary nor capricious. In stark contrast, the plaintiffs contend that the FHWA's approval of the FEIS is not only contrary to the letter and spirit of the relevant laws and regulations, but also that the FEIS approved by the FHWA is based upon spurious assumptions and data wholly defying common sense. The plaintiffs' position is perhaps summarized by this quote from their reply brief:

> To summarize the argument of the plaintiffs, albeit somewhat colloquially, there are holes in this FEIS wide enough to drive a truck through. The plaintiffs urge the Court to find, on the other hand, that these holes are too wide to build a highway through.

Plaintiffs' reply brief at 22–23.

### Overview of Relevant Statutes and Regulations

In order to better understand the respective positions of the parties, the court will provide a brief overview of the relevant statutes and regulations implicated in this case:

### National Environmental Policy Act (NEPA)

In the National Environmental Policy Act of 1969, Congress specifically "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment," and resolved "to recreate and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331. "These sweeping goals have inspired some commentators to call NEPA an environmentalist Magna Carta." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 193 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).

"It is 'well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process.'" *Holy*

*Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1522 (10th Cir.1992) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989)). "NEPA commands agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." *Citizens Against Burlington,* 938 F.2d at 193–194.

■ The federal court's review of agencies' decisions is circumscribed by the highly deferential abuse of discretion standard of review:

> Just as NEPA is not a green Magna Carta, federal judges are not the barons at Runnymede. Because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). As the Supreme Court has warned, "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot ' "interject itself within the area of discretion of the executive as to the choice of the action to be taken." ' " *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (per curiam) (citation omitted); *see Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) ("Neither [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.").

*Citizens Against Burlington,* 938 F.2d at 194.

"Under NEPA, 'major Federal actions significantly affecting the quality of the human environment' must be preceded by an environmental impact statement or EIS. 42 U.S.C. 4332(2)(C)." *Holy Cross,* 960 F.2d at 1521 (citations omitted).

The EIS requirement serves two important functions:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson,* 490 U.S. at 349, 109 S.Ct. at 1845. NEPA specifies five specific issues which must be addressed in the EIS:

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. 4332(2)(C). Thus, "through a set of 'action-forcing' procedures" NEPA requires agencies to take a "hard look" at the environmental consequences of proposed actions. *Robertson,* 490 U.S. at 350 [109 S.Ct. at 1846].

*Holy Cross,* 960 F.2d at 1521.

### Executive Order 11990

■ In 1977, President Carter issued executive Order 11990 pursuant to and in furtherance of NEPA. *Harris v. United States,* 19 F.3d 1090, 1093 (5th Cir.1994). This executive order has the force and effect of a statute enacted by Congress. *Id.* Executive Order 11990 requires, *inter alia,* that all federal agencies shall

take action to minimize the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities for (1) acquiring, managing, and disposing of Federal lands and facilities; and (2) providing Federally undertaken, financed, or assisted construction and improvements; and (3) conducting Federal activities and programs affecting land use, including but not limited to water and related land resources planning, regulating, and licensing activities.

Exec. Order No. 11990, § 1(a), 42 Fed.Reg. 26,961 (1977), *reprinted as amended in* 42 U.S.C. § 4321 note (1988).

### Clean Water Act (CWA)

"In 1972 Congress enacted the Clean Water Act 'to restore and maintain the chemical, physical and biological integrity of the Nation's waters.' 33 U.S.C. § 1251(a)." *Sierra Club v. Lujan,* 972 F.2d 312, 313 (10th Cir. 1992). Under 33 U.S.C. § 1311 of the CWA, it is illegal to discharge pollutants into United States waters unless authorized by specific sections of the Act. *Sierra Club,* 972 F.2d at 313. Under the CWA, dredge or fill material may not be discharged without obtaining from the Army Corps of Engineers (Corps) a permit, commonly known as a section 404 permit. 33 U.S.C. § 1344(a); *Holy Cross,* 960 F.2d at 1524. " 'Waters of the United States' includes wetlands." *Id.* (citations omitted). "The Corps has a particular duty under the CWA to protect wetlands." *Id.*

As part of the permit process, the Corps is obligated to conduct a "public interest review." 33 C.F.R. § 320.4(a). In addition to complying with its own regulations, the Corps, in issuing section 404 permits, must also comply with guidelines developed in conjunction with the EPA, known as 404(b)(1) Guidelines. 40 C.F.R. Part 230. Finally, 33 C.F.R. Part 230 contains regulations for implementation of NEPA by the Corps, which are intended to sup-

plement the CEQ regulations implementing NEPA. 40 C.F.R. § 1500, *et seq.* The EPA may veto the issuance of a permit which will have an "unacceptable adverse effect" on, inter alia, a wetland ecosystem. *See* section 404(c) of the CWA, 33 U.S.C. § 1344(c); 40 C.F.R. § 231.1(a), 231.2(e).

*Id.* at 1524–1525 (footnotes omitted).

### Section 4(f) of the Department of Transportation Act

Section 4(f) [5] of the Transportation Act, 49 U.S.C. § 303, provides that it is United States policy "that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a). Title 49, section 303(c) states:

The Secretary [of Transportation] may approve a transportation program or project ... requiring the use of publicly owned land of a public park [or] recreation area ... only if—

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park [or] recreation area ... resulting from such use.

The implementing provisions of this section are found at 23 C.F.R. § 771.135.

"A virtually identical provision is contained in the Federal–Aid Highways Act, 23 U.S.C. § 138." *Committee to Preserve Boomer Lake Park v. DOT,* 4 F.3d 1543, 1549 (10th Cir.1993).

### Standard of Review

"The [APA] provides that '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof,' 5 U.S.C. § 702, and [the Supreme Court has] read the Act as embodying a 'basic presumption of judicial review.' " *Mount Evans Co.*

**5.** "Section 4(f), which protected certain public lands and all historical sites, technically was repealed in 1983 when it was codified without substantive change, as 49 U.S.C. § 303." 23 C.F.R. § 771.107(e) n. 2. Apparently to avoid

confusion, the courts and regulations promulgated by the FHWA continue to refer to this portion of the code as "Section 4(f)." *See id.; Committee to Preserve Boomer Lake Park v. DOT,* 4 F.3d 1543, 1549 (10th Cir.1993).

*v. Madigan,* 14 F.3d 1444, 1449 (10th Cir. 1994) (quoting *Lincoln v. Vigil,* —— U.S. ——, ——, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967))). Actions of agencies reviewed under the APA shall not be overturned unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Holy Cross,* 960 F.2d at 1521 (to determine whether a decision to grant a section 404 permit violated NEPA and/or the CWA, court must review "permitting decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) to determine whether it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"); *Conservation Law Foundation of New England, Inc. v. Federal Highway Administration,* 24 F.3d 1465, 1471 (1st Cir. 1994) (administrative actions taken under NEPA, § 404 of CWA, § 4(f) of DOTA and § 176 of the CAA are subject to a highly deferential abuse of discretion standard of review).

The court examines whether the agency based its decision on consideration of relevant factors, whether there has been clear error of judgment, and whether the agency complied with procedural requirements. *Citizens to Preserve Overton Park [v. Volpe],* 401 U.S. [402] at 416, [91 S.Ct. 814, 823–24, 28 L.Ed.2d 136]. While the court is to make a "searching and careful" inquiry into the facts, it is not to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park,* 401 U.S. at 416, [91 S.Ct. at 823–24]. Judicial review focuses on the administrative record existing before the agency. *Camp v. Pitts,* 411 U.S. 138, 142, [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973).

*State of Kan., ex rel. Todd v. United States,* 791 F.Supp. 1491, 1494 (D.Kan.1992), *aff'd,* 995 F.2d 1505 (10th Cir.1993).[6]

### Standards for Summary Judgment

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,*

---

**6.** The FHWA vehemently argues that the APA limits judicial review of its action solely to consideration of the Administrative Record. As the plaintiffs suggest, this general rule is subject to certain, limited exceptions.

A reviewing court may go outside of the administrative record only for limited purposes. For example: Where the administrative record fails to disclose the factors considered by the agency, a reviewing court may require additional findings or testimony from agency officials to determine if the action was justified, *Overton,* 401 U.S. at 420, 91 S.Ct. at 825–26; or where necessary for background information or for determining whether the agency considered all relevant factors including evidence contrary to the agency's position, *Thompson v. United States Dept. of Labor,* 885 F.2d 551, 555 (9th Cir.1989); or where necessary to explain technical terms or complex subject matter involved in the action, *Animal Defense Council v. Hodel,* 867 F.2d 1244, 1244 (9th Cir.1989), and *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988). *Franklin Sav. v. Director, Office of Thrift Super.,* 934 F.2d 1127, 1137 (10th Cir.1991), *cert. de-*

nied, —— U.S. ——, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992). *See Friends of Payette v. Horseshoe Bend Hydroelectric,* 988 F.2d 989, 997 (9th Cir. 1993) ("Generally, review of agency action, including review under NEPA, is limited to the administrative record but may be expanded beyond the record if necessary to explain agency decisions."); *National Audubon Soc. v. U.S. Forest Service,* 4 F.3d 832, 841 (9th Cir.1993) (certain circumstances, such as an allegation that an EIS has failed to mention a serious environmental consequence, failed to adequately discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism under the rug, may justify expanding review beyond the record or permitting discovery).

In the case at bar, the court concludes that the plaintiffs have failed to produce any evidence sufficient to demonstrate that a genuine issue of material fact precludes summary judgment in the defendant's favor or that demonstrates that it is appropriate to consider evidence beyond the Administrative Record.

475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings); *see also Vega v. Kodak Caribbean, Ltd.* 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

In general, when the court is presented with cross-motions for summary judgment, the court attempts to synthesize the uncontroverted facts into a single account that fairly and accurately states the uncontroverted facts so as to make the court's opinion clear and concise. In addition, consolidating the uncontroverted facts avoids unnecessary duplicity and hypothetically conserves the court's limited resources.

■ In this case, the court's attempt to consolidate the uncontroverted facts into a single account has been an unduly difficult task as the plaintiffs, in responding to the defendant's motion for summary judgment and in setting forth their statement of uncontroverted facts in their motion for summary judgment, have failed to comply with D.Kan. Rule 206.[7] D.Kan.Rule 206 provides in pertinent part:

(c) **Motions for Summary Judgment.** The memorandum or brief in support of a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists. The facts shall be numbered and shall refer with particularity to those portions of the record upon which movant relies.

A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and if applicable, shall state the number of movant's fact that is disputed. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically con-

---

**7.** The FHWA's motion for summary judgment, in compliance with D.Kan.Rule 206, sets forth its statement of uncontroverted facts with direct citation to the Administrative Record and to stipulated facts. In responding to the plaintiffs' motion for summary judgment, the FHWA incorporates by reference relevant portions of its motion for summary judgment.

troverted by the statement of the opposing party. The statements required by this subsection shall be in addition to the material otherwise required by these rules and the *Federal Rules of Civil Procedure.*

The plaintiffs' response to the defendant's motion for summary judgment, while challenging some of the defendant's statements of uncontroverted facts, is generally not supported by direct citation to the Administrative Record. The defendant's statement of facts are essentially uncontroverted. Under the local rule, the court deems the defendant's statement of uncontroverted facts as admitted. In their motion for summary judgment, the plaintiffs do incorporate by reference the stipulated facts to be incorporated into the pretrial order. However, as to all remaining factual assertions, the plaintiffs simply intersperse the "Argument" section of their memorandum with references to the Administrative Record. As this court stated in *Money v. Great Bend Packing Co., Inc.,* 783 F.Supp. 563, 567 (D.Kan.1992), "D.Kan. Rule 206 serves several valuable purposes, including reducing the burden placed upon the court in determining motions for summary judgment." In their reply brief, the plaintiffs concede that their memorandum does not comply with D.Kan.Rule 206(c), but argue:

> Nonetheless, the fact that these factual assertions were made in the context of a motion for summary judgment should have been sufficient to put the defendant on notice that these were also "material facts as to which [the plaintiffs contend that] no genuine issue exists." The plaintiffs note that these additional assertions were, with a few exceptions, based on the administrative record filed by the defendant.

Plaintiffs' reply brief at 2. The plaintiffs also argue that

> [i]n the interest of a full and final consideration of this matter on its merits, the plaintiffs respectfully request that the court accept the above factual statements, which were set forth in the body of the Plaintiffs' Memorandum, as if they were

set forth in a separate section at the beginning of the memorandum as required by D.Kan.Rule 206(c).

Plaintiffs' reply brief at 10–11.

Undoubtedly, the manner in which the plaintiffs have presented their motion for summary judgment has placed an incremental burden on both the court and the defendant. It should not be the court's burden to sift through the plaintiffs' brief and then scour the Administrative Record in an attempt to locate those portions referred to by the plaintiffs. *See* D.Kan.Rule 206. In regard to the plaintiffs' statement of uncontroverted facts, the court concludes that the plaintiffs' failure to comply with D.Kan.Rule 206 is essentially fatal to their motion for summary judgment. In any event, the court, having considered all of the plaintiffs' arguments, concludes that the defendant is nevertheless entitled to summary judgment.

**Uncontroverted Facts** [8]

**GENERAL OVERVIEW**

1. The parties stipulate to the authenticity of the documents in the Administrative Record.

2. The SLT in Lawrence, Douglas County, Kansas, is a Federal-aid highway project.

3. The Federal-aid Highway Program is a reimbursement program whereby the FHWA reimburses the Kansas Department of Transportation (KDOT) for eligible costs on Federal-aid highway projects in the State of Kansas.

4. KDOT enters into contracts with construction companies to perform most construction activities on Federal-aid projects in the State of Kansas. FHWA has not performed construction on the SLT, and will not perform construction on the SLT.

5. KDOT, Kansas cities, or Kansas counties secure easements or obtain right-of-way for Federal-aid projects. FHWA has not acquired right-of-way for the SLT, and will not acquire right-of-way for the SLT. FHWA's right-of-way acquisition authority is limited to the situations noted in 23 C.F.R.

---

**8.** At the court's request, the parties have supplied the court with computer diskettes containing copies of the stipulated facts and all of the mem-

orandums submitted pertaining to these cross-motions for summary judgment.

§ 712, Subpart E, which are not applicable to the SLT.

6. Consideration of a southern bypass highway project in Lawrence began on the local level as early as 1964 when it was one option explored for the possible relocation of US–59, a major north/south highway through the city, away from its location on Iowa Street. The *Lawrence Area Transportation Study—1964.* published in June, 1967, suggested a southern bypass around the City of Lawrence.

7. The *Lawrence Area Transportation Study—1971*, prepared for the City of Lawrence in cooperation with the Kansas State Highway Commission and FHWA, further studied the issue of a southern bypass.

8. The 1971 study provided a number of route alternatives. Of these alternatives, a recommended route for the south bypass was located south of the Wakarusa River, "to avoid encroachment on the Baker University Wetlands Research Area, Haskell Indian Junior College, or both properties."

9. The 1971 study further provided that, [t]he west bypass which starts at US–59 and goes to US–40 was included in the recommended plan but the demand for this facility was not sufficient to warrant construction during this time period, but this is part of the ultimate transportation plan for the study area.

10. In January, 1974, KDOT prepared a *Reconnaissance Resort* for the relocation of US–59 on the east side of Lawrence.

11. A Draft Environmental Impact Statement (DEIS) for the easterly bypass of Lawrence was circulated in September of 1974, but due to the lack of interest and opposition to the project, no FEIS was prepared.

12. Neither the south of the Wakarusa alternative nor the eastern bypass alternatives were advanced as Federal-aid projects when a Draft Environmental Impact Statement (DEIS) for the easterly bypass was circulated in 1974. These alternatives were discussed, however, in the SLT FEIS as background.

13. The first direct FHWA involvement on the SLT project occurred at two meetings held on April 11, 1986, between representatives of FHWA, KDOT, Douglas County (the County), the City of Lawrence (the City), and Howard Needles Tammen & Bergendoff (HNTB), an engineering firm retained by the City and County to prepare environmental documentation for the project.

14. At two meetings held on April 11, 1986, FHWA informed the City of Lawrence (the City), Douglas County (the County), KDOT, and Howard Needles Tammen & Bergendoff (HNTB) that it would be necessary to prepare an Environmental Impact Statement (EIS) in accordance with all applicable Federal laws and regulations for Federal funding to be available for the project.

15. A follow-up meeting was held on May 9, 1986, at which requirements for the preparation of an EIS were discussed.

16. A Notice of Intent to Prepare an EIS for the proposed SLT was published in the Federal Register on June 23, 1986. The notice stated that the project corridor "runs east—west near 31st Street in South Lawrence from K–10 to the Clinton Dam and north—south from Clinton Dam to the Kansas Turnpike." The notice also stated that several alternatives would be considered including no building and that various alignments within the corridor would be studied.

17. Federal funding was provided for part of the SLT by Section 149(a)(72) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA). Congress directed the Secretary of Transportation to carry out a demonstration project in Douglas County, Kansas,

> to demonstrate methods of reducing traffic congestion and facilitating the usage by motorists on the Interstate System of recreational facilities by construction of a north-south limited access trafficway of approximately 4 miles in length which will connect an east-west interstate route to a reservoir and a university research park. (AR Ex 15 ¶ (a)(72).

Section 149(k) of the same Act authorized the Secretary,

> to carry out, in Lawrence, Kansas, a bypass project which is a model for its cost-

sharing arrangement and economic development goals. (AR Ex 15).

18. Section 1 of the SLT satisfies the requirements of Sections 149(a)(72) and 149(k) of the STURAA of 1987.

19. In 1988, Section 345 of the Department of Transportation and Related Agencies Appropriations Act of 1988 amended Section 149(a)(72) of the STURAA of 1987 by describing the project as:

> a limited access road of approximately 14 miles in length which, at its western terminus, will provide access from an east-west Interstate highway route to a reservoir and a university research park, will proceed easterly around the southern portion of the City of Lawrence and, at its eastern terminus, will provide access to a business park and a limited access east-west State highway.

20. The SLT as described in the FEIS and the Record of Decision (ROD) satisfies the requirements of Section 345 of the Department of Transportation and Related Agencies Appropriations Act of 1989.

21. The DEIS was prepared and released to Federal, State and local agencies and to the public for comment on February 19, 1987. Several public viewing stations for the DEIS were established in Lawrence. In addition, copies were distributed to Baker University, Haskell Indian Junior College and Kansas University.

22. Numerous comments to the DEIS were received from the public and from local, State, and Federal resource agencies.

23. EPA comments on the project were made available to the public on June 5, 1987. EPA expressed concern about the impact on wetlands and suggested that realignments be made and that mitigation plans be included in the final EIS.

24. On August 5, 1987, FHWA authorized KDOT to proceed with preliminary right-of-way and engineering activities necessary to advance the SLT project through the location stage approval. This authorization related only to the portion of the trafficway authorized by the STURAA of 1987.

25. In 1987 a Functional Assessment of the 31st Street Wetlands was conducted by KDOT to determine the significance of the wetlands to be impacted by the SLT. (AR Ex 25).

26. During the preparation of the EIS and the related environmental studies, numerous project modifications and extensive mitigation commitments were made in response to comments received from the public and from State and Federal agencies. For example, the project was realigned to avoid impacts to the Elkins Prairie.

27. A Public Information Meeting to update interested parties on project development was held on April 6, 1988. Written and oral comments from the public were accepted.

28. No new issues were raised at the Public Information Meeting on April 11, 1988.

29. Throughout progress of the project, mitigation measures to minimize environmental harm was the topic of discussions between FHWA, the City, County, KDOT, and other federal and state agencies.

30. The FEIS was approved by FHWA and released to the public on January 4, 1990.

31. The ROD was issued on June 5, 1990.

32. FHWA has been intimately involved in the environmental process for the SLT and in all environmental issues including those raised by this lawsuit since the April 11, 1986, meeting at which the city, county and state were advised by FHWA that it would be necessary to prepare an EIS.

## APPLICABILITY OF SECTION 4(f) TO THE NEWLY CREATED LAWRENCE PRAIRIE PARK (COUNTS I AND II OF PLAINTIFF'S COMPLAINT)

33. In 1991, after approval of the ROD, the City of Lawrence acquired a privately owned piece of property, Mary's Lake, to be incorporated into a City Park on the lake's northern boundary, the Lawrence Prairie

Park.[9] The south side of the Mary's Lake property is adjacent to the SLT. City officials acquired the property with the intent that a portion of the south side would be used for the SLT.

34. The FEIS and ROD showed the SLT passing along the south side of the Mary's Lake property and taking a strip of land for right-of-way from its south side.

35. The City acquired the Mary's Lake property in 1991 and deeded the south 100 feet to the County to be used as right-of-way for the SLT in June, 1992. Since that time, a minor project change has resulted in complete avoidance of use of any land from the Mary's Lake property including the 100 feet deeded to the county.

36. In 1990, when the ROD for the SLT was issued, the FHWA determined that Section 4(f) did not apply to the Mary's Lake property because Mary's Lake was in private ownership.

37. The conversion of the privately owned Mary's Lake property to publicly owned parkland occurred after the issuance of the ROD for the SLT.

38. FHWA regulations provide that there is no constructive use of Section 4(f) property from possible proximity impacts resulting from a project, when: 1) an applicant's adoption of a project location or the Administration approval of a FEIS established the location for a proposed transportation project before the designation, establishment, or change in the significance of the resource; or 2) the public park and transportation facility are jointly planned.

39. Lawrence Prairie and the SLT were jointly planned by the City of Lawrence and Douglas County.

40. FHWA determined the SLT will result in no use of the Lawrence Prairie Park including Mary's Lake within the meaning of Section 4(f).

## ADEQUACY OF THE FEIS (COUNTS III THROUGH VIII OF PLAINTIFFS' COMPLAINT)

41. The FEIS discusses the following five topics that are required by NEPA, 42 U.S.C. § 4332(2)(C): (1) The environmental impacts of the proposed action; (2) Any adverse environmental effects that cannot be avoided should the proposal be implemented; (3) Alternatives to the proposed action; (4) The relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) Any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.

42. The FEIS discusses all reasonable alternatives to the proposed action in detail. A study review team ranked all reasonable alternatives based upon twelve evaluation factors that were assigned a weight corresponding to their relative importance.

43. The FEIS does not consider the alignment south of the Wakarusa River for the southern segment of the SLT because such an alignment is not a reasonable alternative to the SLT. A route south of the Wakarusa River involves many of the same environmental concerns associated with the route north of the Wakarusa River (wetlands and frog habitat impacts), requires an additional one mile of travel, and requires two additional river crossings. Its cost is higher than the preferred route described in the FEIS.

44. The FEIS also does not consider an eastern route for routing through traffic away from 23rd Street in detail. An eastern alignment would not relieve traffic congestion on 23rd Street and, therefore, is not a reasonable alternative to the SLT.

45. The eastern bypass is a separate subject of study and is not an element of the SLT project. The eastern bypass concept was addressed in a 1973 *Reconnaissance Report* and in a 1974 DEIS prepared by the State Highway Commission of Kansas. The

---

**9.** Prior to the time that the City of Lawrence acquired the property, Mary's Lake was appar-

ently a private recreational facility or park.

eastern bypass was dropped from further consideration in the mid–1970s when it was determined that construction costs would be extremely high and public support for the project was absent.

46. Public transportation was *briefly* discussed in the DEIS and in the FEIS. Improved public transportation could provide some relief for internal-internal trips, but would not divert a significant number of vehicles that enter or pass through the Lawrence area.

47. Public transportation is not a reasonable alternative to the SLT.

48. Forecasts of future traffic on the existing street and highway network, supported by recent growth trends, show that the current network is incapable of handling future traffic volumes at an acceptable level of service. Reliance on the current network is not a reasonable alternative to the SLT.

49. KDOT and FHWA reviewed the future traffic projections prepared by HNTB for the SLT and determined the conclusions reached by HNTB were supportable.

50. With certain intersection and mid-block improvements (possibly consisting of signals, widening, etc.) that are within the City's ability to finance, 23rd Street could be improved to serve 26,000 vehicles per day (VPD) with tolerable peak hour delay. Any growth of demand volume beyond 26,000 vpd must be diverted to alternate routes. A Peak Hour Level Of Service (LOS) F is predicted by the year 2010 at 23rd Street and Iowa Street, and at 23rd Street and Louisiana, due to traffic demand on 23rd Street of 32,000 to 35,000 vpd without the trafficway. LOS F is the lowest level of service and is an unacceptable level of service to most drivers.

51. The FEIS demonstrates that the SLT will help meet the need to relieve peak-hour traffic congestion at 23rd and Iowa Streets. The existing street network (1980–1982) Level of Service (LOS) in the 23rd Street and Iowa area is currently LOS–C. The estimated existing street network projected for the year 2010 Level of Service at 23rd Street and Iowa is LOS–F without the SLT. The estimated proposed LOS with the South Law-

rence Trafficway for the year 2010 is LOS–D at 23rd Street and LOS–C at Iowa Street.

52. The FEIS considers the cumulative effect of the SLT on protected wetlands resulting from the construction of the project and from the indirect effects of the proposed project. Cumulative and indirect effects and major impacts and mitigation measures were considered.

53. FHWA has extensively considered the effect of the SLT on wetlands. All information necessary for the issuance of a Section 404 Permit by the United States Corps of Engineers has been provided and extensive steps have been taken to minimize the impact of the SLT on jurisdictional wetlands.

54. The SLT will not take any property from the Baker Wetlands. The wetlands that have been determined to be impacted by the SLT are located on the existing 31st Street right-of-way between the property line of the Baker Wetlands and 31st Street and in the ditch along both sides of 31st Street. The project in the vicinity of the Baker Wetlands is designed with a closed drainage system and reduced median width.

55. The Corps of Army Engineers, pursuant to their responsibility in the Section 404 permit process, performed a Wetlands Assessment and determined that the area between existing 31st Street and the existing levee of the Haskell (Baker) Wetlands, the property line of the Baker Wetlands, is a wetland subject to the 404 permitting process. The Environmental Section of KDOT performed a wetlands functional assessment using the FHWA endorsed "Adamus methodology" on the area to be impacted by the SLT. The project had impacts of sufficient magnitude to warrant mitigation. The mitigation plan is described in the FEIS. In brief, the mitigation plan apparently intends to transform certain areas into wetlands by the controlled flooding of water into artificial ponds. In addition to the use of pumping facilities to maintain the water level in the pools, the mitigation plan relies on other measures to create a wetland area similar to the impacted wetland area.

56. The Adamus Method used to perform the wetlands functional assessment provides

a procedure for converting typical field observations of a wetland into preliminary statements regarding the wetlands' probable values for natural functions of wetlands in general.

57. The Adamus Method includes three separate procedures. Procedure I is known as a threshold analysis, which investigates how the wetlands function in ecosystems. It is not meant to be definitive of the intricate functions of wetlands; however, broad functions can be more easily understood by the public. Procedure I must be completed before Procedure II or Procedure III can be done. Procedure II is a comparative analysis for deciding the relative importance of two or more wetlands with similar value ratings. Procedure III is an analysis of mitigation options and includes parameters of economic and function costs of mitigation alternatives.

58. In May, 1988, FHWA became aware of other applications to the Corps of Army Engineers for Section 404 Permits in the project area by various individuals and expressed concern about the cumulative impacts from the Section 404 Permits.

59. The Corps of Engineers considered the cumulative effects of the requested 404 permits and based the granting of the permits on appropriate mitigation.

60. The FEIS provides mitigation procedures to assure that there will be no net loss of wetlands in accordance with Executive Order 11990. The effectiveness of proposed wetlands mitigation techniques has been thoroughly evaluated by FHWA.

61. Mitigation of the 11.89 acres that will be impacted will be accomplished at a triangular area north of 35th Street and east of Haskell. The construction of a water level control device in this area has the potential of flooding 15.3 acres in the off-site location. This creation of wetlands will result in a net gain of 3.41 acres of wetlands, not a net loss of wetlands.

62. The Corps of Engineers does not consider agency 404 permit applications until completion of the environmental process. In accordance with this procedure the Section 404 Permit for the SLT was issued by the Corps on April 22, 1993.

63. FHWA has been particularly concerned with the effects of the SLT on the habitat of the Northern Crawfish Frog in the development of this project.

64. Impacts to the Northern Crawfish Frog habitat were considered to be sufficient by the Kansas Department of Wildlife and Parks to require habitat mitigation as a part of their permitting process. The SLT will impact 11.89 acres of Northern Crawfish Frog habitat.

65. The FEIS discusses the impacts on the habitat of the Northern Crawfish Frog and the proposed mitigation for the loss of frog habitat.

66. The SLT will be coincident with 31st Street, from Haskell to Louisiana Streets, to minimize intrusion into both potential habitat and wetlands south of existing 31st Street.

67. A reduced median width and an enclosed drainage system are incorporated into this design as mitigation measures to limit the area of intrusion to the Northern Crawfish Frog habitat.

68. In addition to the closed drainage system and reduced median width, a habitat mitigation site located in a triangular tract of land, adjacent to a tributary of the Wakarusa River, north of 35th Street and east of Haskell Street will be constructed.

69. The mitigation includes the construction of four breeding pools varying in depth from 6–24 inches that will contain about four surface acres.

70. The habitat mitigation construction also calls for a water control structure to retain rainfall and overflow from the creek during periods of high flow and to release water into the creek as part of the area's management plan.

## ALLEGED CONFLICT OF INTEREST OF LANDPLAN ENGINEERING (COUNT IX OF PLAINTIFFS' COMPLAINT)

71. Landplan Engineering, a subconsultant of HNTB, was retained by HNTB to collect some of the data to be used in the preparation of the EIS.

72. According to the contract between HNTB and Landplan Engineering, Landplan Engineering had the primary responsibility for providing information with regard to utility locations; land use and zoning; previous planning, transportation, and route studies; existing right-of-way and property information; anticipated socio-economic impacts; and land use evaluation including impacts on existing land uses, future development patterns, and land values. HNTB and Landplan Engineering had joint responsibility for establishing study goals and objectives; identifying local issues; preliminary screening of feasible route locations; selection of alternatives for further study; analysis of the preliminary routes for traffic service and preliminary engineering; collection of information for the environmental assessments; preparation of concept strip plans for the selected alternative; preparation of the draft environmental assessment for submittal to KDOT and FHWA; preparation of the final corridor report; participation in regular project meetings; and presentations at the public meetings. HNTB reserved for itself, among other things, the responsibility for identification of all feasible routes, the selection of the preferred route, and making consultant recommendations.

73. The County and City actually made the decisions regarding selection of the preferred alignment of the SLT. Ultimately Landplan Engineering did not perform that portion of the agreement that made it jointly responsible with HNTB for the preparation of the draft environmental assessment (EA) when it became apparent that an EIS would be required. For this same reason, Landplan Engineering performed none of the tasks identified on page 4 of Attachment A of its agreement with HNTB.

74. The contract between HNTB and Landplan Engineering was for a period of six months commencing in September of 1985. The initial contract specified the study corridor north of the Wakarusa River that was ultimately defined in the STURAA of 1987 when the SLT became a Demonstration Project.

75. The only additional agreement between HNTB and Landplan Engineering was for Landplan Engineering's attendance at study team meetings between June 1, 1986, and August 31, 1986. Landplan Engineering was paid an additional $350 for attendance at those meetings. Landplan Engineering attended the later public information meeting, but did not bill HNTB for its time.

76. Clark Coan, a Plaintiff herein, first raised the issue of an alleged conflict of interest by Landplan Engineering, P.A. in violation of Council on Environmental Quality (CEQ) regulations, 40 C.F.R. § 1506.5(c), in a letter dated April 22, 1987.

77. FHWA reviewed the allegations of conflict of interest and thoroughly investigated the matter. FHWA determined that there was no conflict of interest and that the provisions of 40 C.F.R. § 1506.5(c) do not apply to subcontractors such as Landplan Engineering.

78. When FHWA first investigated this issue, the inquiry focused on land ownership by Landplan Engineering in the vicinity of the SLT.

79. Landplan Engineering's list of clients contains approximately 400 names, including the City of Lawrence, Douglas County, Bob Billings, Charles Dunbar, and Bruce Snodgrass.

80. Many of the clients are involved in projects that they hope will benefit from the construction of the SLT.

81. Landplan Engineering is identified among the "Preparers" of the EIS.

82. There were instances in 1987, 1988, and 1989, when Landplan Engineering rendered professional services to clients with property interests in the immediate vicinity of the South Lawrence Trafficway.

83. FHWA's later investigation addressed a possible violation of 40 C.F.R. § 1506.5(c) on the part of Landplan Engineering in the preparation of the EIS for the SLT. FHWA indicated to KDOT that Landplan Engineering should be requested to:

1. Confirm, deny and/or explain the nature of the professional and business relationships alleged;

2. Disclose any additional professional and business relationships with any oth-

er parties which may benefit from the project;

3. Explain any property interest Landplan Engineering may have in land located in the study area; and

4. Clarify that it has no interest in the "outcome of the project" rather than no interest in the "outcome of the EIS".

84. FHWA further asked KDOT to request that HNTB evaluate the information and offer opinions with regard to whether the business and professional interests of Landplan Engineering had any effect on the objectivity of the EIS.

85. The October 10, 1989, response from Landplan Engineering took the position that the CEQ conflict of interest regulations do not apply since Landplan Engineering is a subcontractor. Despite its reservations about the applicability of the regulations, Landplan Engineering provided information in response to FHWA's request and filed a disclosure statement.

86. In its evaluation of the submission on behalf of HNTB, Alfred J. Horn, P.E., HNTB Project Manager, pointed out that the study team, made up of representatives of the County (usually three representatives), the City (usually four representatives), KDOT, HNTB, and Landplan Engineering, ratified study findings and made all major decisions.

87. Landplan Engineering assisted HNTB in identifying all reasonable and feasible alignments for the roadway within the study corridor, assisted in the preparation of the DEIS, and assisted HNTB and the County in conducting the corridor public hearing and the update meeting.

88. Landplan Engineering collected data and provided knowledge of existing land use and property values, but it had no role in identifying all feasible routes, which HNTB reserved for itself. Landplan Engineering did not participate in the selection of alternative traffic routes.

89. It was FHWA's analysis that the questions presented by the conflict of interest allegation were: (1) Is Landplan Engineering subject to the conflict of interest and disclosure requirements of 40 C.F.R. § 1506.-5(c)? (2) If Landplan Engineering is subject to the conflict of interest and disclosure requirements of 40 C.F.R. § 1506.5(c), is there a conflict of interest on the part of Landplan Engineering within the meaning of the regulation? (3) If there is a conflict of interest on the part of Landplan Engineering, is disqualification of Landplan Engineering from participation in the environmental process necessary? (4) If there has been a violation of NEPA, has the integrity of the environmental process been compromised?

90. FHWA's analysis of the conflict of interest issue found no conflict of interest in violation of 40 C.F.R. § 1506.5(c).

### Analysis

At the outset, the court notes that it has carefully reviewed the briefs of the parties, the relevant law, and the Administrative Record. Although the court has considered all of the arguments advanced by the parties, the court will make no attempt to specifically address each and every argument advanced by the parties. This memorandum and order will only address the key aspects of the issues raised by the parties.

### Count I and II

The plaintiffs contend that Section 4(f) will be violated by the SLT's encroachment into an area known as Mary's Lake. The City of Lawrence is incorporating Mary's Lake into a new park, the Lawrence Prairie Park. The City of Lawrence acquired Mary's Lake after the FHWA approved the FEIS and issued the ROD. At the time the FEIS was prepared, Mary's Lake was a privately owned recreational area or park. The SLT will be located approximately 100 feet from Mary's Lake.

The defendant contends that there will be no violation of Section 4(f) of the DOT Act because the SLT will not actually use any land from the Lawrence Prairie Park; a minor project change avoids actual use of the property. Under 23 C.F.R. 771.135(p)(iv), the defendant contends that there will be no constructive use of the Mary's Lake property because the park at Mary's Lake was established after FHWA approved the FEIS for that location. In the alternative, the defendant argues that the SLT and the park have

been jointly planned and that there is no constructive use of parkland under such circumstances.

The plaintiffs concede that the modifications to the project will avoid any physical taking of the Mary's Lake property. The plaintiffs contend, however, that the high volume of traffic on the SLT projected in the future will severely impair the use and enjoyment of the public park. Specifically, the plaintiffs argue that the volume of noise generated by traffic on the SLT will destroy the traditional use of Mary's Lake, namely fishing. The plaintiffs argue that this impairment constitutes a constructive use of the park within the meaning of the FHWA regulations defining constructive use.

The plaintiffs concede that under the FHWA regulations (23 C.F.R. 771.-135(p)(5)(ii) and (iv)), no constructive use of Mary's Lake will occur. However, the plaintiffs ask the court to construe those regulations in such a way that they do not conflict with NEPA, the DOT Act, or the Council on Environmental Quality regulations. The plaintiffs also challenge the defendant's assertion that the Lawrence Prairie Park and the SLT were jointly planned.

In response to these arguments, FHWA argues that it is inappropriate for the plaintiffs to challenge 23 C.F.R. 771.135(p)(5) at this point in the case, as this argument has not been presented at any point during the pendency of this case. FHWA argues that it is inappropriate for the plaintiffs' to raise this argument in response to its motion for summary judgment. The FHWA further elaborates on its contention that there will be no constructive use of the park and its contention that the park and the SLT were jointly planned by the City of Lawrence.

In their reply brief, the plaintiffs contend that they are not asserting a new argument and that in any event, the cases cited by the FHWA concerning raising new arguments are inapplicable as the party's barred from asserting new arguments in those cases were bound by the pretrial order. The plaintiffs note that a pretrial order has not been entered in this case. The plaintiffs contend that the legal issues contained within their proposed pretrial order are broad enough to encompass the arguments raised in their briefs on these cross-motions for summary judgment.

In any event, the plaintiffs contend that they are not arguing that the FHWA regulations are "invalid." Instead, the plaintiffs contend that they "have merely urged the court not to apply these FHWA regulations in this case in such a way as to contradict the express purpose of NEPA and Section 4(f)." The plaintiffs contend that Mary's Lake has always been used as a recreational facility and that it is anomalous to interpret 23 C.F.R. § 771.135(p)(5)(iv) "as allowing the degradation of land that has been traditionally used by the public as a park merely because title to the land did not change until after the approval of the FEIS." The plaintiffs contend that the conflict between the FHWA regulations and Section 4(f) arises "in part because of the unusual status of Mary's Lake at the time of the preparation of the FEIS, when it was a privately-owned park that was open to public use; all that has really changed in the interim is how the title to the land is recorded at the courthouse." The plaintiffs urge the court to construe 23 C.F.R. 771.135(p)(5)(ii) and (iv) so that it is in harmony with the legislative history of Section 4(f) and the policy of the United States as set forth in 23 U.S.C. § 138.

In their motion for summary judgment, the plaintiffs argue that even if Section 4(f) does not apply to Mary's Lake, the FEIS should be supplemented.

As defined in 23 C.F.R. § 771.135, the term "use" generally includes "constructive use" of land. *See* 23 C.F.R. § 771.-135(p)(1)(iii). 23 C.F.R. § 771.135(p)(2) defines constructive use:

> Constructive use occurs when the transportation project does not incorporate land from a section 4(f) resource, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, fea-

tures, or attributes of the resource are substantially diminished.

23 C.F.R. § 771.135(p)(4) provides:

The Administration has reviewed the following situations and determined that a constructive use occurs when:

(i) The projected noise level increase attributable to the project substantially interferes with the use and enjoyment of a noise-sensitive facility of a resource protected by section 4(f), such as hearing the performances at an outdoor amphitheater, sleeping in the sleeping area of a campground, enjoyment of a historic site where a quiet setting is a generally recognized feature or attribute of the site's significance, or enjoyment of an urban park where serenity and quiet are significant attributes;

(ii) The proximity of the proposed project substantially impairs esthetic features or attributes of a resource protected by section 4(f), where such features or attributes are considered important contributing elements to the value of the resource. Examples of substantial impairment to visual or esthetic qualities would be the location of a proposed transportation facility in such proximity that it obstructs or eliminates the primary views of an architecturally significant historical building, or substantially detracts from the setting of a park or historic site which derives its value in substantial part due to its setting;

23 C.F.R. § 771.135(p)(5), states in pertinent part:

The Administration has reviewed the following situations and determined that a constructive use does not occur when:

(ii) The projected traffic noise levels of the proposed highway project do not exceed the FHWA noise abatement critieria (sic) as contained in Table 1, 23 CFR part 772, . . .

.      .      .      .      .

(iv) There are proximity impacts to a section 4(f) resource, but a governmental agency's right-of-way acquisition, an applicant's adoption of project location, or the Administration approval of a final environmental document, established the location for a proposed transportation project before the designation, establishment, or change in the significance of the resource.

(v) There are impacts to a proposed public park, recreation area, or wildlife refuge, but the proposed transportation project and the resource are concurrently planned or developed.

(emphasis added).

■ Under terms of these regulations, it appears that the FHWA has correctly concluded that there is no constructive use of Mary's Lake for the SLT. First, assuming that the SLT actually violates 23 C.F.R. § 771.135(p)(5)(ii), it is clear that under the express terms of § 771.135(p)(5)(iv) there is no constructive use of Mary's Lake. As to the plaintiffs' argument that they are not challenging the validity of § 771.135(p)(5)(iv), but only asking the court to construe it in a manner consistent with the express purposes of NEPA and section 4(f), the only way to "construe" the regulation in a manner favorable to the plaintiffs' position would be to ignore its plain language. Although the plaintiffs argue that they are not seeking to invalidate the regulation but only to construe it harmoniously with federal laws, this distinction appears to be primarily a play on semantics. In any event, the court will apply the regulation by its express terms.

In the alternative, under the uncontroverted facts it appears that there is no constructive use of Mary's Lake as the SLT and the park were jointly planned. In *Sierra Club v. Department of Transportation*, 948 F.2d 568 (9th Cir.1991), the Ninth Circuit held that under section 4(f), there is no constructive use of park land where a road and a park are jointly planned. 948 F.2d at 575. The court of appeals explained:

Read as a whole, section 4(f) is meant to discourage a new road where the community has already decided a park should exist. Section 4(f) accomplishes this objective by withholding federal funding from such a road. Section 4(f) is not meant to force upon a community, wishing to establish a less than pristine park affected by a road, the choice between a pristine park and a road. A community faced with this

choice might well choose not to establish any park, thus frustrating section 4(f)'s goal of preserving the natural beauty of the countryside.

948 F.2d at 574. The court concludes that there was no actual or constructive use of Mary's Lake.

■ Turning to the plaintiffs contention that the FEIS should be supplemented, the court concludes that the plaintiffs have failed to demonstrate that supplementation is required under the relevant regulations.

Under applicable CEQ regulations, agencies

> [s]hall prepare supplements to either draft or final environmental impact statements if:
>
> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. 1502.9(c)(1); *see also* 33 C.F.R. 230.13(b).

Courts review an agency decision regarding the need for a supplemental EIS under the "arbitrary and capricious" standard of the APA, 5 U.S.C. 706(2)(A). *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). This is so because the decision whether to prepare a supplemental EIS "is similar to the decision whether to prepare an EIS in the first instance," and is highly factual. *Id.* at 374, 377 [109 S.Ct. at 1859, 1861]; *see also Village of Los Ranchos de Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir.1992); *Sierra Club v. Lujan,* 949 F.2d 362, 367 (10th Cir.1991). Accordingly, "as long as the Corps' decision not to supplement the FEISS was not 'arbitrary and capricious,' it should not be set aside." *Marsh,* 490 U.S. at 377 [109 S.Ct. at 1861].

That standard of review is narrow. *See id.* at 378 [109 S.Ct. at 1861–62] ("in making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, [91 S.Ct. 814, 823–24,] 28 L.Ed.2d 136 (1971)). The agency's discretion is broad: When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive. On the other hand, in the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information. *Id.* at 378 [109 S.Ct. at 1861–62].

*Holy Cross,* 960 F.2d at 1524.

■ Under these restrictive standards, the court concludes that supplementation of the FEIS to consider the impact on Mary's Lake is unnecessary.

### Counts III through VIII

In Counts III through VIII, the plaintiffs essentially challenge the adequacy of the FEIS evaluation of the impact of the SLT and the FEIS' failure to consider reasonable alternatives. The primary arguments advanced by the plaintiffs are:

(1) The FEIS fails to consider reasonable alternatives to the SLT project;

(2) The traffic projections in the FEIS are inadequate or illogical;

(3) The FEIS fails to consider cumulative and indirect impact of the SLT project;

(4) The FEIS fails to identify all wetlands in the SLT project corridor; and

(5) The wetland mitigation plan in the FEIS is inadequate as it does not assure that a net loss of wetlands will not occur.

FHWA responds, arguing that the FEIS carefully considers each and every point disputed by the plaintiffs and that the conclusions reached in the FEIS are clearly supported by the Administrative Record.

## Adequacy of the FEIS

"A court reviewing the adequacy of an EIS merely examines 'whether there is a reasonable, good faith, objective presentation of' the topics NEPA requires an EIS to cover." *Holy Cross*, 960 F.2d at 1522 (quoting *Johnston v. Davis*, 698 F.2d 1088, 1091 (10th Cir.1983)); *see All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1445 (10th Cir.1992) ("In reviewing a challenge to the adequacy of an EIS, . . ., our job is not to 'second-guess experts' in policy matters but rather to determine 'whether the statement is a good faith, objective, and reasonable presentation of the subject areas mandated by NEPA.'") (quoting *Manygoats v. Kleppe*, 558 F.2d 556, 560 (10th Cir.1977)); *see Resources Ltd., Inc. v. Robertson*, 8 F.3d 1394, 1400 (9th Cir.1993).[10]

> Judicial review of an EIS is limited to a consideration of the following: (1) does the EIS discuss all of the five procedural requirements listed in 42 U.S.C. 4322(C); (2) does the EIS constitute a good faith compliance with the demands of NEPA; and (3) does the statement contain a reasonable discussion of the subject matter involved in the five respective areas?

*Holy Cross*, 960 F.2d at 1522 n. 9 (quoting *Johnston v. Davis*, 698 F.2d at 1091 (quoting *Save Our Invaluable Land (SOIL), Inc. v. Needham*, 542 F.2d 539, 542 (10th Cir.1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977))).

> Stated another way, in considering a challenge to the adequacy of an EIS a "court should 'ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the de-

cisionmaker to take a "hard look" as environmental factors, and to make a reasoned decision.'"

*All Indian Pueblo Council*, 975 F.2d at 1445 (quoting *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir. 1988) (quoting *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 371 (D.C.Cir.1981))).

The court will address each of the plaintiffs' arguments seriatim.

## Does the FEIS consider reasonable alternatives to the SLT project?

The plaintiffs contend that the FEIS' consideration of reasonable alternative to the SLT project is woefully deficient. Specifically, the plaintiffs contend that the FEIS fails to consider the following alternatives: the "South–of–the–Wakarusa Route," the "Eastern Bypass," and the increased use of public transportation. The plaintiffs complain that the FEIS gives cursory consideration to each of these viable and superior alternatives.

FHWA responds, contending that the FEIS contains a detailed discussion of all reasonable alternatives to the SLT. The FHWA contends that the fact that certain alternatives are dispensed without significant elaboration does not undermine the accuracy of the FEIS or demonstrate noncompliance with the relevant laws and regulations.

In *All Indian Pueblo Council*, the Tenth Circuit recently summarized the importance of the discussion of alternatives:

> The discussion of alternatives that 4332(2)(C)(iii) requires is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14 (1986). NEPA requires a "detailed" EIS "*to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project* (including total abandonment of the project) which would alter the environmental impact and

**10.** In *Resources Ltd.*, the court stated:
In reviewing the adequacy of an EIS, this circuit employs a 'rule of reason' that asks whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. A reviewing judge must make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-

making and informed public participation. . . . Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end.
8 F.3d at 1400 (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992) (citations and quotation marks omitted)).

the cost-benefit balance." *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n,* 449 F.2d 1109, 1114 (D.C.Cir.1971) (emphasis added). As another court observed, "[i]t is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that we have characterized as 'the linchpin of the entire impact statement.'" *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 92 (2d Cir.1975) (emphasis added). We agree that a thorough discussion of the alternatives is imperative.

In addressing alternatives to a proposed action in an EIS, federal agencies must "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (1986). Concerning the requisite level of detail necessary, "what is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *National Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 836 (D.C.Cir. 1972)), *quoted with approval in Environmental Defense Fund, Inc.,* 619 F.2d at 1375. NEPA does not require agencies to analyze "the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective." *City of Aurora v. Hunt,* 749 F.2d 1457, 1467 (10th Cir.1984).

975 F.2d at 1444.

"[W]e test the discussion of alternatives in an EIS under a "rule of reason" standard of review." 975 F.2d at 1445. *See Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1375 (10th Cir.1980) (" '[T]he requirement in NEPA of discussion as to reasonable alternatives does not require 'crystal ball' inquiry.' ") (quoting *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 837 (D.C.Cir. 1972)).

■ The court concludes that the FEIS adequately considers all reasonable alternatives to the SLT. Chapter 4 of the FEIS is dedicated entirely to a discussion of "Alignments Eliminated From Further Study." Although the plaintiffs disagree with the defendant's ultimate assessment of the alternatives, that fact does not demonstrate that the FEIS is defective.

### Are the traffic projections in the FEIS inadequate or illogical?

The plaintiffs assert that the "primary purported goal of the SLT is the reduction of traffic on 23rd Street." The plaintiffs challenge the defendant's assertion that the FEIS' conclusion that the SLT will help meet the need to relieve peak-hour traffic congestion at 23rd and Iowa Streets. The plaintiffs contend that an examination of the traffic projections in the FEIS demonstrate that those projections violate common sense and cannot be accepted as reliable.

The FHWA responds, arguing that completion of the SLT will accomplish several goals, not just one. In the "Summary" section of the FEIS, the evaluation of need for the SLT was predicated upon the desire "to relieve congestion on the two primary arterial streets in the south and west section of the City and improve access to both the University and Clinton Lake." In regard to the plaintiffs' challenges to the traffic projections found in the FEIS, the FHWA argues that any "discrepancies" are insignificant and simply result "from actual traffic counts being used for the 1982 numbers while the 2010 numbers were derived from computer modeling, which produces a conservative estimate."

The FHWA argues that the traffic analysis is based upon the assumption that drivers will choose to take the path of least time delay to complete their trips. Based upon this assumption, 50% to 70% of the vehicles that will use the trafficway will be for local trips. Based upon the traffic projections found in the FEIS, the SLT will result in substantial time savings for persons traveling through and within Lawrence.

In their reply brief, the plaintiffs challenge the FEIS' assumption that drivers will make the rational choice of selecting the most ex-

pedient route. According to the plaintiffs, "[h]uman beings simply don't have access to all the information they need to make 'rational' decisions, their perceptions are subjective, and their behavior is not always rationally connected to any readily apparent facts." The plaintiffs argue that the FEIS does not demonstrate that there will be time savings associated with internal-to-internal trips.

■ The court, having carefully reviewed the FEIS' traffic projections, concludes that the plaintiffs' assertions are largely unsubstantiated or without merit. The traffic projections found within the FEIS are simply that: projections of anticipated traffic in the future. The plaintiffs appear to impose a standard of proof virtually impossible for anyone to meet, yet at the same time seek to challenge the FEIS' projections based upon their own unsubstantiated conjecture. Because the FHWA is not prescient, it is impossible to precisely forecast exact numbers of persons who will use the SLT. Based upon the Administrative Record, the court is not persuaded that the FEIS traffic projections defy common sense or lack any reasonable basis in fact.

As to the plaintiffs' argument that humans do .not always make the most rational decisions, it is correct that humans are not perfect and that drivers will not, in every instance, take the most expedient route available. Nevertheless, the fact that the FEIS is based upon the assumption drivers are rational does not demonstrate that the FEIS is invalid. To base future projections of traffic upon the assumption that drivers will choose the most expedient route is clearly reasonable. Should the traffic projections in the FEIS have been based upon the driving habits of irrational drivers? Moreover, if the plaintiffs' argument on this point were to be accepted, what proposed project could survive judicial scrutiny?

In sum, the court concludes that the FEIS traffic projections do not defy common sense

and otherwise appear to be reasonable predictions of the future needs for the SLT.

## Does the FEIS fail to consider the cumulative and indirect impact of the SLT project? [11]

■ The plaintiffs contend that the FEIS fails to adequately consider the cumulative impact of the SLT as required by NEPA and 40 C.F.R. § 1508.25. Title 40, section 1508.7 defines "cumulative impact" to mean

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

NEPA also requires consideration of "indirect effects" of the SLT. *See Seattle Community Council Federation v. F.A.A.,* 961 F.2d 829, 835 (9th Cir.1992). Title 40, section 1508.8 provides:

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indi-

---

11. According to the plaintiffs' brief in response to the FHWA's motion for summary judgment, the plaintiffs have advanced similar arguments in their "Memorandum in Support of Motion for Leave to File Amended and Supplemental Complaint" (Dk. 37). That motion is currently pending before the magistrate judge. By ruling in favor of the FHWA on the cross-motions for summary judgment, the court in no way expresses its opinion upon the merits of the plaintiffs' "Motion for Leave to File Amended and Supplemental Complaint".

rect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

The plaintiffs contend that the FEIS' failure to adequately consider the cumulative impact and the indirect effects of the SLT entitles them to summary judgment on this issue.

The FHWA responds to the plaintiffs' claims, arguing that the FEIS clearly and exhaustively considers both the cumulative impact and the indirect effects of the SLT. The FHWA contends that "[t]he administrative record also reflects significant involvement by FHWA in considering the effect of the SLT on wetlands."

The court, having reviewed the uncontroverted facts, the FEIS and the administrative record, concludes that the FEIS has considered the cumulative impact and the indirect effects of the SLT.

### Does the FEIS fail to identify all wetlands in the SLT project corridor?

The Record of Decision states that

[a]ll wetlands impacted by this project were identified through a complete analysis of the proposed alignment by the U.S. Army Corps of Engineers, and have been shown in the FEIS. Additionally, no other wetlands were identified through the comprehensive review made as part of the development of the EIS. If wetland conditions or criteria change and additional wetlands are identified, they will be coordinated with the resource agencies and appropriate mitigation measures taken.

Record of Decision, AR Ex. 95 at 5.

■ The plaintiffs concede that the Administrative Record does contain "a thorough review of the wetland characteristics of the 31st Street Wetlands and the Haskell Wetlands." The plaintiffs contend, however, that there are at least two wetland sites which have been identified near the SLT corridor. The plaintiffs also argue that "scattered evidence in the FEIS indicates the possible presence of other wetlands in the project corridor." Based upon their assessment of the Administrative Record, the plaintiffs contend that there are sites in the SLT corridor that deserve further scrutiny.

The FHWA responds, arguing that "the proposed route of the SLT was investigated, including those areas noted by the plaintiffs, with the finding that no other jurisdictional wetlands existed within the SLT corridor."

The court concludes that the FEIS identifies all wetlands within the SLT corridor.

### Is the FEIS wetland mitigation plan adequate?

■ The FEIS indicates that construction of the SLT will intrude upon 11.89 acres of wetlands. The FEIS provides for mitigation of the 11.89 acres. Although the plaintiffs concede that the FEIS discusses in detail the plan for mitigation of the loss of wetlands, the plaintiffs argue that the mitigation plan in the FEIS does not assure that there will be no net loss of wetlands. The plaintiffs also dispute the efficacy of the mitigation procedures prescribed by the FEIS, arguing that "it is not clear that its is scientifically feasible to create a permanent, functional wetland." The plaintiffs also argue that the "FEIS is inadequate and should be supplemented with sufficient information for a decision maker to determine whether there are practicable alternatives to the proposed action and whether 'all practical measures to minimize harm to wetlands' have been considered."

The FHWA responds, arguing that it has given extensive consideration to the wetlands that will be impacted by the construction of the SLT, and that the FEIS mitigation plan actually creates an additional 3.41 acres of wetlands.

In *Holy Cross*, the Tenth Circuit recently discussed the need for the FEIS to include an adequate discussion of mitigation features:

As the relevant statutes, regulations and case law make clear, "the discussion of steps that can be taken to mitigate adverse environmental consequences" plays an important role in the environmental analysis under NEPA. *Robertson*, 490 U.S. at 351 [109 S.Ct. at 1846]; see also 40 C.F.R. 1508.25(b), 1502.14(f), 1502.16(h), 1505.2(c).

The Supreme Court in *Robertson* considered how detailed and specific the mitiga-

tion discussion contained in an EIS must be. After noting the "fundamental distinction" between "a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been evaluated" and "a substantive requirement that a complete mitigation plan be actually formulated and adopted," the Court refused to require "a fully developed plan that will mitigate environmental harm before an agency can act." *Robertson*, 490 U.S. at 352–53 [109 S.Ct. at 1847]. Nor does NEPA impose any substantive requirement that mitigation measures be implemented. *Id.* at 353 [109 S.Ct. at 1847]; *see also Citizens Against Burlington, Inc. v. Busey*, 290 App.D.C. 371, 938 F.2d 190, 206 (D.C.Cir.) ("NEPA not only does not require agencies to discuss any particular mitigation plans that they might put in place, it does not require agencies— or third parties—to effect any."), *cert. denied*, [—— U.S. ——,] 112 S.Ct. 616 [116 L.Ed.2d 638] (1991).

There must, however, be a "reasonably complete discussion of possible mitigation measures." *Robertson*, 490 U.S. at 352 [109 S.Ct. at 1847]. Thus, in *Robertson*, an EIS describing specific mitigation measures which could be taken by third parties, although containing no assurance that they would in fact be taken by those third parties, was held adequate.

960 F.2d at 1522–1523.

As evidenced by the Administrative Record, it is clear that the FHWA has taken a "hard look" at the issue of mitigation and that the FEIS contains a reasonably complete discussion of possible mitigation measures. The court concludes that the FEIS' mitigation plan adequately assures that there will be no net loss of wetlands.

### Count IX

In Count IX, the plaintiffs contend that the FEIS "is defective because the project would aid proposals sponsored by other clients of one of the firms involved in the preparation of the EIS, and because said firm had financial or other interests in the outcome of the project, in violation of NEPA, 42 U.S.C. § 4332(C) and (E), and 40 C.F.R. § 1506.5." Specifically, the plaintiffs contend that on September 23, 1985, Landplan Engineering, a Lawrence firm, subcontracted with Howard Needles Tammen & Bergendoff (HNTB) to assist in the preparation of the Draft Environmental Impact Statement (DEIS) and FEIS for the SLT. The plaintiffs contend that several of Landplan Engineering's clients are persons involved in projects which they hope will benefit from the construction of the SLT. The plaintiffs contend that if the SLT is constructed, Landplan Engineering will directly profit from the ample business opportunities it will create in the area. The plaintiffs contend that these business relationships created a conflict of interest for Landplan Engineering.

The FHWA responds to these claims, making the following arguments:

(1) Landplan Engineering is not subject to the conflict of interest and disclosure requirements of 40 C.F.R. § 1506.5(c);

(2) Even if Landplan Engineering is subject to the disclosure and conflict of interest requirements of 40 C.F.R. § 1506.5(c), it has no conflict of interest within the meaning of the regulation;

(3) Even if it is determined that a conflict of interest exists, it is not necessary to *disqualify* Landplan Engineering from participation in the EIS process;

(4) Even if a violation of NEPA existed, the integrity of the environmental process was not compromised.

### Analysis

NEPA's procedures are designed to protect the integrity of the decisionmaking process by ensuring that "stubborn problems or serious criticism [are not] swept under the rug." *Sierra Club v. Marsh*, 714 F.Supp. 539, 548–49 (D.Me.1989) (quoting *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir.1973)). "In addition to declaring a national environmental policy, 42 U.S.C. § 4321, and prescribing general methods and procedures for implementing the policy, 42 C.F.R. § 4332, *et seq.*, NEPA created the Council on Environmental Quality [CEQ], 42 U.S.C. § 4332(2)(C)." *Sierra Club*, 714 F.Supp. at 549 n. 9. In 1978, the CEQ promulgated regulations, 40 C.F.R. Part 1500, which are

intended to provide direction to public officials attempting to comply with the NEPA process. 40 C.F.R. § 1500.1. The regulations found in Parts 1500 through 1508 are "applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969." 40 C.F.R. § 1500.3.

To aid in the selection and use of contractors in EIS preparation, the CEQ has promulgated 40 C.F.R. § 1506.5(c), which provides:

> Environmental impact statements. Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

"The intent of these regulations is 'to minimize the conflict of interest inherent in the situation of those outside the government coming to the government for money, leases or permits while attempting impartially to analyze the environmental consequences of their getting it.' " *Sierra Club*, 714 F.Supp. at 549 (quoting *Sierra Club v. Sigler*, 695 F.2d 957, 963 n. 3 (5th Cir.1983) (quoting 43 Fed.Reg. 55, 987 (1978))).

In *Andrus v. Sierra Club*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), the Supreme Court stated that "CEQ's interpretation of NEPA is entitled to substantial deference." 442 U.S. at 358, 99 S.Ct. at 2341. " '[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....' " *National Indian Youth Council v. Watt*, 664 F.2d 220, 228 (10th Cir.1981) (quoting *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)).

In *Sierra Club*, the plaintiff argued that the FHWA violated the conflict of interest regulations in failing to require certain persons who had been involved in the preparation of an EIS to submit disclosure statements. In assessing whether the conflict of interest regulations had been violated, the court distinguished between "preparers" and "participants" in the drafting of an EIS:

> The court can find no guidance, either in the regulations, case-law, or explanatory materials published by the CEQ, as to the meaning of the term "preparer." The regulation governing the table of preparers does not define the term "preparer," but merely states that "[n]ormally the list will not exceed two pages." 40 C.F.R. § 1502.-17. Absent guidance, and unless inconsistent with the regulation itself, the term "preparer," as used in reference to a written document such as an EIS, should be given its usual meaning; that is, a "preparer" is one who puts in written form or draws up a document, *see* Webster's Third New International Dictionary (Unabridged), at p. 1790 (1976). Clearly, not every participant in the EIS process need be listed as a preparer. An important distinction between the preparer of a document, and someone who participates in gathering information used in preparing it, is the discretion possessed by the preparer, to accept, reject or modify the information submitted for consideration by subordinate participants in the EIS process. Mere coordination of a DEIS response team, for instance (or mere responsibility for drafting proposed responses to EIS comments), absent evidence that the coor-

dinating consultant (or scrivener) has been given decisionmaking authority by the lead agency to determine EIS content, as distinguished from the responsibility to inform and make recommendations to the agency, would not make the consultant a "preparer."

714 F.Supp. at 551. The district court concluded that it is appropriate to list persons who had submitted "significant background papers" used in the preparation of the EIS in the table of preparers. *Id.*

In regard to which persons must submit disclosure statements under 40 C.F.R. § 1506.5(c), the district court stated:

> Considering the plain language of section 1506.5(c), and the CEQ's interpretation of it, *see, CEQ Forty Questions,* 46 Fed.Reg. at 18031 ("a consulting firm preparing an EIS must execute a disclosure statement...."), the FHWA reasonably interprets section 1506.5(c) as requiring that a conflict of interest disclosure statement be filed only by a contractor engaged to prepare the EIS, not by a contractor engaged to prepare significant background papers.

714 F.Supp. at 552.

■ In March 1981, the CEQ issued a document titled *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations,* 46 Fed.Reg. 18026 (March 23, 1981). The document is often referred as *Forty Questions.*[12] In that document, CEQ, *inter alia,* answered the following question:

> 17a.  Q.  If an EIS is prepared with the assistance of a consulting firm, the firm must execute a disclosure statement. What criteria must the firm follow in determining whether it has any "financial or other interest in the outcome of the project" which would cause a conflict of interest?

> A.  Section 1506.5(c), which specifies that a consulting firm preparing an EIS must execute a disclosure statement, does not define "financial or other interest in the outcome of the project." The Council interprets this term broadly to cover any known benefits other than general enhancement of professional reputation. This includes any financial benefit such as a promise of future construction or design work on the project, as well as indirect benefits the consultant is aware of (e.g., if the project would aid proposals sponsored by the firm's other clients). For example, completion of a highway project may encourage construction of a shopping center or industrial park from which the consultant stands to benefit. If a consulting firm is aware that it has such an interest in the decision on the proposal, it should be disqualified from preparing the EIS, to preserve the objectivity and integrity of the NEPA process.

> When a consulting firm has been involved in developing initial data and plans for the project, but does not have any financial or other interest in the outcome of the decision, it need not be disqualified from preparing the EIS. However, a disclosure statement in the draft EIS should clearly state the scope and extent of the firm's prior involvement to expose any potential conflicts of interest that may exist.

In July 1983, in response to confusion and criticism to its interpretation of § 1506.5(c), the CEQ published further guidance regarding conflict of interests:

> Section 1506.5(c) of the NEPA regulations contains the basic rules for agencies which choose to have an environmental impact statement prepared by a contractor. That section requires the lead or cooperating agency to select the contrac-

---

**12.**  In contrast to the deference accorded to CEQ regulations, courts have consistently held that the *Forty Questions* publication is not binding or entitled to substantial deference. The *Forty Questions* publication is merely an informal statement and is not controlling authority. *Friends of the Earth v. Hintz,* 800 F.2d 822, 837 n. 15 (9th Cir.1986); *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C.Cir. 1982) (*Forty Questions* merely an informal state- ment and is not persuasive authority); *Abenake Nation of Mississquoi v. Hughes,* 805 F.Supp. 234, 244 (D.Vt.1992) (collecting cases holding that *Forty Questions* is not binding), *aff'd,* 990 F.2d 729 (2nd Cir.1993). "Unlike the regulations considered in the *Andrus* case, [the *Forty Questions*] was not the product of notice and comment procedures and does not impose a mandatory obligation on all federal agencies." *Cabinet Mountains Wilderness,* 685 F.2d at 682.

tor, to furnish guidance and to participate in the preparation of the environmental impact statement. The regulation requires contractors who are employed to prepare an environmental impact statement to sign a disclosure statement stating that they have no financial or other interest in the outcome of the project. The responsible federal official must independently evaluate the statement prior to its approval and take responsibility for its scope and contents.

During the recent evaluation of comments regarding agency implementation of the NEPA process, the Council became aware of confusion and criticism about the provisions of Section 1506.5(c). It appears that a great deal of misunderstanding exists regarding the interpretation of the conflict of interest provision. There is also some feeling that the conflict of interest provision should be completely eliminated.

Applicability of § 1506.5(c)

This provision is only applicable when a federal lead agency determines that it needs contractor assistance in preparing an EIS. Under such circumstances, the lead agency or a cooperating agency should select the contractor to prepare the EIS.

This provision does not apply when the lead agency is preparing the EIS based on information provided by a private applicant. In this situation, the private applicant can obtain its information from any source. Such sources could include a contractor hired by the private applicant to do environmental, engineering, or other studies necessary to provide sufficient information to the lead agency to prepare an EIS. The agency must independently evaluate the information and is responsible for its accuracy.

Conflict of Interest Provisions

The purpose of the disclosure statement requirement is to avoid situations in which the contractor preparing the environmental impact statement has an interest in the outcome of the proposal. Avoidance of this situation should, in the Council's opinion, ensure a better and more defensible statement for the federal agencies. This requirement also serves to assure the public that the analysis in the environmental impact statement has been prepared free of subjective, self-serving research and analysis.

.    .    .    .    .

Section 1506.5(c) prohibits a person or entity entering into a contract with a federal agency to prepare an EIS when that party has at that time and during the life of the contract pecuniary or other interests in the outcomes of the proposal. Thus, a firm which has an agreement to prepare an EIS for a construction project cannot, at the same time, have an agreement to perform the construction, nor could it be the owner of the construction site. However, if there are no such separate interests or arrangements, and if the contract for EIS preparation does not contain any incentive clauses or guarantees of any future work on the project, it is doubtful that an inherent conflict of interest will exist. Further, § 1506.5(c) does not prevent an applicant from submitting information to an agency. The lead federal agency should evaluate potential conflicts of interest prior to entering into any contract for the preparation of environmental documents.

*Guidance Regarding NEPA Regulations,* 48 Fed.Reg. 34263.

■ As the CEQ suggests, true conflicts of interest impair the objectivity of decisionmakers. Unabated perceptions of conflicts of interest undermine public confidence in decisions possibly tainted by avarice and greed. The court fully appreciates the possible ramifications of a conflict of interest affecting the objectivity of the analysis of the project; a serious conflict of interest in and of itself could compromise the environmental process and require a complete reevaluation of a project such as the SLT. Consequently, the court has carefully considered this conflict of interest issue.

■ Based upon the evidence presented, it appears that no conflict of interest within the meaning of § 1506.5(c) existed. Although the plaintiffs have raised several concerns, it is apparent that the FHWA has given careful consideration to this issue.

Moreover, based upon the court's assessment of the evidence presented, the court is persuaded that no conflict of interest within the meaning of § 1506.5(c) existed.

While the characterization of an entity as a "preparer" or a "participant" is analytically possible, under the facts of this case it is difficult to unequivocally determine whether Landplan Engineering is properly considered a mere participant. On balance, it appears that Landplan Engineering was merely a participant. Assuming, *arguendo,* that Landplan Engineering was more than a participant, it does not appear that it had a conflict of interest within the meaning of § 1506.5(c). As the FHWA contends, the contract between HNTB and Landplan Engineering did not contain any incentive clauses or guarantees of future work. Moreover, although the plaintiffs indicate that Landplan Engineering would directly benefit financially from the SLT project, FHWA's investigation indicated that Landplan Engineering would not receive a financial windfall if the SLT were to be constructed. Nor is the court persuaded that LandPlan Engineering should have been disqualified from participation in the EIS process. In any event, the court is persuaded that the integrity of the environmental process was not compromised by any conflict of interest. *See Brandon v. Pierce,* 725 F.2d 555, 563–564 (10th Cir.1984); *Sierra Club,* 714 F.Supp. at 583.

In sum, based upon the evidence and arguments presented, the court concludes that the FHWA is entitled to summary judgment. Although the plaintiffs believe that the FHWA's ultimate decision concerning the SLT project to be serious error, the court is persuaded that the defendant has taken a "hard look" at all the environmental issues implicated by the SLT project. Moreover, the court is not convinced that the other issues raised by the plaintiffs undermine the FHWA's actions. Under the restrictive and deferential standard governing this court's review, the court is compelled to conclude that the FHWA's actions in this case were not arbitrary, capricious or contrary to the law.

IT IS THEREFORE ORDERED that the FHWA's motion for summary judgment (Dk. 41) is granted.

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment (Dk. 43) is denied.